UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| THOMAS MORRIS, | : | Case No. 3:11-cv-428 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS FOUND SUPPORTED BY SUBSTANTIAL EVIDENCE, AND AFFIRMED; AND (2) THIS CASE IS CLOSED**

This is a Social Security disability benefits appeal. At issue is whether the administrative law judge ("ALJ") erred in finding the Plaintiff "not disabled" and therefore unentitled to disability insurance benefits ("DIB"). (*See* Administrative Transcript ("Tr.") (Tr. 9-19) (ALJ's decision)).

**I.**

On October 8, 2008, Plaintiff applied for disability insurance benefits, asserting that he was disabled and could no longer work beginning July 27, 2002. (Tr. 151, 180). Plaintiff claims that he was unable to work because of back problems, arthritis, fibromyalgia, and depression. (Tr. 185). Plaintiff's claim was denied initially and on reconsideration. (Tr. 106, 114). Plaintiff requested a hearing, which was held before an ALJ on July 28, 2010. (Tr. 66). Plaintiff and a vocational expert testified at the hearing, with Plaintiff's attorney in attendance. (*Id.*)

The ALJ found that Plaintiff was not disabled because despite several severe impairments, he retained the functional capacity[1] to perform the basic exertional activities associated with light work,[2] as such work is defined for Social Security purposes, but with further restrictions.  (Tr. 62).  The ALJ's decision became final and appealable on October 6, 2011, when the Appeals Council denied Plaintiff's request for review. (Tr. 49).  Plaintiff subsequently filed this action in this Court seeking judicial review pursuant to Section 205(g) of the Act.  *See* 42 U.S.C. §§ 405(g).

Plaintiff is 50 years old (Tr. 17) and has a twelfth grade education (Tr. 191). Plaintiff has past relevant work experience as a construction worker and die caster. (Tr. 17).

The ALJ's "Findings," which represent the rationale of her decision, were as follows:

1.  The claimant last met the insured status requirements of the Social Security Act on March 31, 2008.

2.  The claimant did not engage in substantial gainful activity during the period from his alleged onset date of July 27, 2002 through his date last insured of March 31, 2008 (20 CRF 404.1571 *et seq*.).

3.  Through the date last insured, the claimant had the following severe impairments: (1) chronic back pain with degenerative lumbar disc disease; (2) seropositive rheumatoid arthritis; and (3) obesity (20 CFR 404.1520(c)).

---

[1]  The Agency's regulations define residual functional capacity ("RFC") as "the most you can still do despite your impairments."  20 C.F.R. § 404.1545(a)(1).

[2]  Light work involves lifting no more than 20 pounds occasionally and 10 pounds frequently, and may require a good deal of walking or standing.  20 C.F.R. § 404.1567(b).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: 1) occasional climbing or ramps or stairs; 2) no climbing of ladders, ropes, and scaffolds; 3) occasional stooping, kneeling, crouching, and crawling; 4) occasional reaching overhead bilaterally; 5) frequent handling, fingering, and feeling bilaterally; and 6) no exposure to hazardous machinery or unprotected heights.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on August 5, 1962 and was 45 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the dated last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569 (a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from July 27, 2002, the alleged onset date, through March 31, 2008, the date last insured (20 CFR 404.1520(g)).

(Tr. 11-18).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations and was therefore not entitled to DIB. (Tr. 18).

On appeal, Plaintiff argues that: (1) the ALJ erred in finding that he was not disabled by his physical impairments; (2) the ALJ erred in failing to articulate the weight granted to the opinion of his treating physician, Dr. Sandhir; and (3) the ALJ erred in failing to properly consider the impact of his obesity as required under SSR 02-01P. The Court will address each argument in turn.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, he must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

**A.**

The record reflects that:

In November 2002, Plaintiff attended physical therapy through Samaritan North Rehabilitation for episodic lumbar pain. (Tr. 347).

Treatment notes from Plaintiff's former family physician, Dr. Boggs, begin in February 2003. (Tr. 326). On February 19, 2003, Plaintiff complained to Dr. Boggs that he was very depressed, wanted to sleep all the time, had no interest in activities, and decreased appetite. (*Id*.) The diagnosis was "probable depression" and Plaintiff was prescribed Zoloft. (*Id*.) He continued to be treated with medication for depression through May 2007. (Tr. 325-303).

In October 2003, Plaintiff complained to Dr. Boggs that he had recently blacked out while driving and was suffering from chest pressure and dizziness. (Tr. 317-18). Plaintiff was seen in the emergency room on November 1, 2003 for complaints of chest pain. (Tr. 282). The diagnosis was chest pain with a history of intermittent palpitations.

(Tr. 283).

In August 2003, Plaintiff complained to Dr. Boggs of left shoulder pain, at which time he was diagnosed with rotator cuff strain. (Tr. 320). He was later seen in the emergency room on April 27, 2005 for complaints of left arm pain. (Tr. 278). Physical examination showed exquisite pain with range of motion. (*Id*.) He was diagnosed with left shoulder pain, possible rotator cuff tear. (Tr. 279).

Plaintiff was evaluated by sleep specialist, Dr. Valle, in January 2007 for complaints of sleepiness. (Tr. 297). He underwent a sleep study on March 9, 2007 and was diagnosed with positional sleep apnea and restless leg syndrome. (Tr. 287). He was started on a CPAP machine shortly thereafter. (Tr. 292).

Plaintiff established care with a new family physician, Dr. Sandhir, in July 2007. (Tr. 397, 578). Dr. Sandhir completed a questionnaire at the request of the Bureau of Disability Determination on October 30, 2008. (Tr. 397). His diagnoses included: high blood pressure, sleep apnea, major depression, restless leg syndrome, prediabetes, rheumatoid arthritis, and lumbar stenosis/disc herniation-degeneration. (*Id*.)

On initial visit with Dr. Sandhir, Plaintiff was 5'10" and 254 pounds. (Tr. 575). On October 1, 2007, Plaintiff reported "generalized aching in arms and legs" and the assessment was "arthralgas/muscle aches – etiology unclear." (Tr. 574). Laboratory findings in October 2007 reveal an elevated sedimentation rate of 31. (Tr. 402). In treatment notes from Dr. Sandhir dated March 2008, Plaintiff reported back and shoulder

pain with some improvement from physical therapy. (Tr. 564). On May 1, 2008, he reported generalized achiness and persistent back pain with no relief from medication. (Tr. 560). On September 8, 2008, he reported that he had been receiving injections through pain management but there had been "no improvement at all." (Tr. 556).

Plaintiff was admitted to the hospital on December 27, 2007 with complaints of chest pain and shortness of breath. (Tr. 355). A cardiac catheterization was performed revealing mild left ventricular dysfunction with no significant coronary artery disease. (Tr. 368).

An MRI of the left upper extremity was performed on April 24, 2008. (Tr. 522). The impression was mild rotator cuff tendinitis with partial articular surface tear supraspinatus; mild subdeltoid/subacromial bursitis; mild subcoracoid bursitis; minimal biceps tenosynovitis, and AC joint arthritis with moderate impingement. (Tr. 322-23).

Laboratory findings in April 2008 show a sedimentation rate of 40 with a positive rheumatoid factor. (Tr. 399). Plaintiff was seen by rheumatologist Dr. Ranginwala in June 2008. (Tr. 596-97). Plaintiff complained of pain in multiple joints, including the hands, knees, and back for the last few months and had increased in intensity. (Tr. 596). On examination, there was pain on palpitation of the small joints of the hands and crepitation in the knee joints. (*Id*.) Review of lab work revealed elevated rheumatoid factor and sedimentation rate of 31 mm per hour. (*Id*.) The diagnosis was seropositive rheumatoid arthritis and Plaintiff was started on Plaquenil. (*Id*.)

Plaintiff had little relief and began seeing rheumatologist Dr. Khan in June 2008. (Tr. 428). He complained of significant joint pain, swelling, and stiffness in his hands, shoulders, knees, and feet with morning stiffness lasting about two hours. (*Id*.) On initial examination, there was paraspinal muscle spasm in the lumbosacral area, slight tenderness over the left biceipital tendon and mild decrease in internal rotation of the left shoulder. (*Id*.) There was bilateral trace wrist and MCP synovitis, trace PIP synovitis, and his PIP joint was exquisitely tender. (*Id*.) Lower extremity joint showed swelling at both knees and ankles with MTP compression test positive bilaterally. (*Id*.) The impression was seropositive rheumatoid arthritis, osteoarthritis, and degenerative joint disease spine. (Tr. 429). Dr. Khan added methotrexate and a low dose prednisone. (*Id*.)

In July 2008, Dr. Khan reported that Plaintiff was responding well to methotrexate. (Tr. 427). Examination showed some improvement in range of motion and in PIP synovitis. (*Id*.) Trace wrist and MCP synovitis and trace swelling of the knee and ankle were noted. (*Id*.) MTP compression test was positive bilaterally. (*Id*.) The methotrexate dosage was increased slightly and prednisone was decreased. (*Id*.)

In August 2008, Plaintiff continued to report significant joint pain and stiffness in his hands, wrist, and back. (Tr. 426). Examination showed trace wrist and 1+ MCP synovitis, trace knee and ankle synovitis, and MTP compression test was positive. (*Id*.) It was noted that "he has difficulty making a full fist." (*Id*.) Dr. Khan again increased Plaintiff's methotrexate and restarted a higher dose of Prednisone. (*Id*.)

Plaintiff underwent lumbar and thoracic MRIs, both performed on May 1, 2008. The lumbar MRI impression was: "Multilevel disease, worse at the L4-L5 and L5-S1 levels with subligamentous disc herniations and potential compromise of the central L5 nerve roots within the lateral recesses, perhaps left greater than right at the L4-L5 level and bilateral exiting foraminal L5 nerve roots, right greater than left at the L5-S1 level." (Tr. 451). The thoracic MRI revealed multilevel findings with some discogenic disease and minimal cord flattening T4 through T8. (Tr. 462).

Plaintiff was seen by pain management specialist, Dr. Buenaventura, on June 25, 2008 for treatment of his lower back pain. (Tr. 418). Physical examination at that time found negative straight leg raising, normal motor strength and sensation intact. (Tr. 420). The assessment was lumbar spondylosis. (Tr. 409). He received a thoracic epidural steroid injection on July 21, 2008 and again on August 11, 2008. (Tr. 413, 409). In a treatment note dated June 25, 2008, it was stated that the patient "certainly has bad pathology in his thoracic and lumbar spine that could cause the pain he describes." (Tr. 421).

Plaintiff consulted with neurosurgeon, Dr. Taha, on September 24, 2008. (Tr. 437). Physical examination found Plaintiff weighed 260 pounds with a limping gait and decreased pinprick sensation. (*Id.*) The diagnosis was displacement lumbar inter disc without myelopathy and stenosis. (Tr. 438). Dr. Taha suggested surgery.

On October 9, 2008, Dr. Taha performed a L5-S1 anterior presacral diskectomy with interbody fusion with application of a cage. (Tr. 454). Plaintiff followed up with

Dr. Taha six weeks post-surgery, on November 19, 2008, with no major complaints. (Tr. 532). He was seen approximately one year later, in October 2009, due to complaints of continued back pain, worse with standing or walking for extended periods. (Tr. 529). CT lumbar testing revealed the fusion to be intact with no gross instability with arthritic disease in SI joints, more on the right. (Tr. 527). Plaintiff was referred back to his rheumatologist.

State Agency physicians reviewing the file in January 2009 and July 2009 determined that no severe physical impairments existed through Plaintiff's date last insured. (Tr. 471, 473). State Agency psychologists reviewing the file in December 2008 and June 2009 determined that the evidence was insufficient to establish a severe psychological impairment. (Tr. 469, 472).

Plaintiff returned to Dr. Khan after his back surgery on November 5, 2008, at which time he resumed taking both methotrexate and Prednisone, as they had been stopped several weeks prior to surgery. (Tr. 492). In January 2009, examination revealed: mild paraspinal muscle spasm; trace MCP synotvitis; and no active synovitis or effusions in the lower extremities. (Tr. 490). In April 2009, examination showed: paraspinal muscle spasm; trace wrist and MCP synovitis with the ability to make a full fist; and no active synovitis or effusions in the lower extremities. (Tr. 486). Prednisone was decreased in July 2009. (Tr. 484).

In October 2009, Plaintiff reported increased joint pain and stiffness, especially in his hands, with definite swelling in the small joints. (Tr. 481). He reported that morning

stiffness lasted about an hour. (*Id*.) Physical examination revealed: mild paraspinal muscle spasm; trace wrist synovitis bilaterally; 1+ MCP synovitis in the left hand; trace MCP synovitis of the right hand with the ability to make a fist; and trace ankle synovitis. (*Id*.) The methotrexate dosage was increased. (*Id*.)

In January 2010, Dr. Khan stated that Plaintiff's symptoms were under much better control on a higher dose of methotrexate, however he had been unable to taper Plaintiff off Prednisone completely. (Tr. 635). Plaintiff continued to have persistent pain in his knees and left hand with the worst joint being his right second PIP. (*Id*.) Examination revealed: mild paraspinal muscle spasm; trace wrist synovitis bilaterally; trace MCP synovitis in the left hand, most prominent in the second and third MCP joints (improved from last visit); right second MCP and PIP joints were slightly swollen and tender, particularly the right second PIP joint; and trace ankle synovitis. (*Id*.)

In March 2010, examination by Dr. Khan revealed: mild paraspinal spasm; trace wrist and MCP synovitis, especially at the left second and third MCP joints; right second MCP and PIP joints were slightly tender; slight crepitus at the knees but no active synovitis or effusions. (Tr. 634). It was noted that Plaintiff's "hand pain has been somewhat persistent," and that he had received an injection in the right second MCP and PIP joints at his previous visit. (*Id*.) Plaintiff was referred to occupational therapy.

Plaintiff initiated hand therapy on March 23, 2010. (Tr. 660). He reported being unable to lift/carry a shopping bag, open containers, use a knife, pour from a full container with his left hand, sweep, vacuum, wring a cloth, or manipulate objects with the

-11-

left hand. (*Id*.) He reported having difficulty tying his shoes, fastening waistbands, and manipulating fasteners – tending to use the left hand with the index finger held extended away from objects. (*Id*.)

Plaintiff consulted with podiatrist Dr. Stevenson on December 3, 2009. (Tr. 504). He complained that foot pain worsened with activity and relieved with rest. (*Id*.) Examination revealed pain in the plantar medial heel tubercle; pain at the sinus tars; pain at the plantar aspect of the MP joints; paina long the tibialis posterior tendon sheath, all bilateral. (*Id*.) The diagnoses included neuritis, plantar fasciitis, subtalar joint synovitis, MP joint synovitis, tibialis posterior tendonitis, calcancal spur, and dermatitis. (*Id*.) Plaintiff was fitted with orthodics. (*Id*.)

Plaintiff consulted with Dr. Morar on May 3, 2010 for complaints of persistent back pain. (Tr. 662). Plaintiff reported that his back surgery in 2008 offered some improvement in his pain but that he continued to suffer from severe burning pain in his lower back. (*Id*.) Fluroscopic back evaluation demonstrated severe point tenderness localized at the L4-L5 midline vertebral levels. (*Id*.) Dr. Moror's assessment stated that the patient has tried multiple conservative treatment options and has been on heavy narcotics without any significant improvement. (Tr. 668). He diagnosed long-standing chronic lower back pain with failed back surgery and severe peripheral neuropathy refractory to neuropathic pain medication, localized in the lower back. (*Id*.)

Dr. Sandhir completed a narrative statement dated July 22, 2010. (Tr. 664). He outlined Plaintiff's treatment beginning in July 2007. (*Id*.) He stated that Plaintiff has a

history of muscle aches and arthralgas since October 2007. (*Id*.) He opined that Plaintiff is currently unable to sit or stand for greater than 30 minutes at a time and is unable to do any repetitive movement. (*Id*.) He opined that Plaintiff had exhausted all therapeutic options and that chronic pain impacts his ability to work. He opined that Plaintiff would require lifelong treatment for rheumatoid arthritis and chronic back pain. (*Id*.)

The ALJ focused Plaintiff's testimony on the time period between 2002 and 2008. (Tr. 78-79). Plaintiff testified that his pain is primarily in his back, hands, and feet. (Tr. 83). He testified that he has difficulty dressing every morning, bathing, twisting, and touching his feet. (Tr. 84). He testified that his most comfortable position was lying down, which he would do for about an hour each day. (Tr. 88, 94). He testified that "sometimes my shoulders hurt and I can't raise my arms and my hands get numb or my fingers, and my left hand when it acts up, I can't hold anything in it. It hurts to even touch my finger." (Tr. 90). He testified that he began having back pain "in the '90's. '99, I really noticed it." (Tr. 91). He stated that his first family doctor only prescribed medications, but when he switched physicians, he was sent for testing and rheumatoid arthritis was diagnosed. (*Id*.) He was also sent to a neurosurgeon to evaluate his lower back. (*Id*.) Plaintiff testified that he has swelling in his fingers every day and swelling in his feet if he's "up on them for very long." (Tr. 92).

The vocational expert ("VE") testified that an individual who was limited in the manner provided by the ALJ, with the additional limitation of the ability to use the bilateral upper extremities only on an occasional basis for fine and gross manipulation,

would be precluded from performing all unskilled work. (Tr. 98). The VE testified that "unskilled work requires use of the hands at least frequently." (*Id.*) He also testified that if an individual would be off-task for approximately one third of the work day due to pain, that individual wound not be able to sustain any of the positions listed. (Tr. 99).

**B.**

First, Plaintiff alleges that the ALJ erred in finding that he was not disabled by his physical impairments. Specifically, Plaintiff argues that the ALJ failed to consider the functional impact of his rheumatoid arthritis and chronic back pain and that he has been limited to occasional use of his bilateral upper extremities since prior to his date last insured through the present. Plaintiff also maintains that the ALJ erred in failing to articulate the weight granted to the opinion of his treating physician, Dr. Sandhir. The Court will consider these alleged errors in combination.

First, it is important to note that the relevant period on appeal is from Plaintiff's alleged disability onset date of July 27, 2002 through his date last insured on March 31, 2008. It is Plaintiff's burden to prove that he was disabled prior to his date last insured. *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990) (claimant must prove that he was disabled before insured status expires). On appeal, however, Plaintiff's argument relies almost entirely on evidence after the date last insured. (Doc. 8 at 14-15). Plaintiff offers no proof that this evidence related back to the relevant period beyond his own subjective beliefs. However, it has been held that "medical evidence of a subsequent condition of health, reasonably proximate to a preceding time, may be used to establish the existence

of the same condition at the preceding time." *Begley v. Mathews*, 544 F.2d 1345, 1354 (1976).

As noted by the ALJ, the record contains minimal medical evidence establishing physical impairments or limitations prior to the expiration of Plaintiff's insured status. (Tr. 14). In 2002, Plaintiff complained of back pain, but x-rays showed only "some arthritic changes." (Tr. 11, 277). Plaintiff's clinical examination was also normal, as he was diagnosed with "chronic low back pain," and physical therapy was recommended. (Tr. 277). In 2003 Plaintiff complained of back tenderness, but his clinic examination remained normal. (Tr. 11, 267). Following August 2003, the ALJ observed that there was a void in the evidence until May 2007, as Plaintiff made no complaints to any medical provider relating to complaints of back pain or received any treatment for back pain for several years. (Tr. 12, 14-15, 250-65).

In July 2007, when Plaintiff switched primary care physicians to Dr. Sandhir, the neurological examinations continued to be normal. (Tr. 12, 514, 516, 518, 520, 524). Plaintiff complained of back and shoulder pain to Dr. Sandhir in February 2008, just one month prior to his date last insured (Tr. 12, 513), and again was prescribed physical therapy (Tr. 513). Plaintiff went only to his initial physical therapy evaluation, failed to return for another session, and was subsequently discharged in March 2008 for non-compliance. (Tr. 12, 591-95). Moreover, in March 2008, Plaintiff informed Dr. Sandhir that physical therapy was helping his pain and Dr. Sandhir prescribed only Advil for his symptoms. (Tr. 12, 510-11). Despite the lack of documented physical impairments prior

to the date last insured, the ALJ gave Plaintiff the benefit of the doubt and limited him to a reduced range of light work that involved only occasional climbing and postural limitations and frequent use of his upper extremities. (Tr. 14-15).

In January 2010, almost two years after Plaintiff's date last insured, Dr. Sandhir wrote a letter describing Plaintiff's treatment history. (Tr. 609). In that letter Dr. Sandhir opined the Plaintiff could not "sit or stand for greater than ½ [hour] at a time" and was "unable to do any repetitive movements." (*Id*.) Dr. Sandhir further indicated that Plaintiff's "chronic pain impacts his ability to work" and "further improvement [of his condition] is not anticipated." (*Id*.)

Despite Plaintiff's arguments to the contrary, the ALJ's decision makes clear that she gave no weight to Dr. Sandhir's opinion to the extent that it suggested Plaintiff was disabled prior to his date last insured on March 31, 2008. (Tr. 15). The ALJ also clearly articulated good reasons for giving no weight to Dr. Sandhir's opinion, as required by agency regulations. *See* 20 C.F.R. § 416.927(d)(2).[3] The ALJ found that the record did not document Plaintiff's disabling impairments prior to March 31, 2008. (Tr. 12). Additionally, Dr. Sandhir's January 2010 opinion "does not suggest that those limitations [in her opinion] existed prior to March 31, 2008." (Tr. 15, 609). Moreover, there is no objective evidence of clinical findings before March 31, 2008 to support Dr. Sandhir's assessments. (Tr. 15, 609). In fact, Dr. Sandhir's treatment notes reflect normal

---

[3] If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the record, it must be given controlling weight and adopted. SSR 96-2P. Moreover, the ALJ is required to give specific reasons for rejecting the opinion of a treating physician. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 245-46 (2007).

neurological findings throughout 2007. (Tr. 514, 516, 518, 520, 524). In March 2008, Dr. Sandhir's treatment notes indicate that physical therapy was helping Plaintiff's pain complaint, which caused Dr. Sandhir to prescribe only Advil to treat Plaintiff's symptoms. (Tr. 12, 510-11). Therefore, the ALJ properly gave no weight to Dr. Sandhir's assessment. *Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 175-76 (6th Cir. 2009) ("where the opinion of a treating physician is not supported by objective evidence or is inconsistent with the other medical evidence in the record, this Court generally will uphold an ALJ's decision to discount that opinion."). Moreover, the record provides no objective evidence to support a finding that Plaintiff was disabled by his physical impairments prior to the date last insured.

The issue is not whether the record could support a finding of disability, but rather whether the ALJ's decision is supported by substantial evidence. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). Substantial evidence supports the ALJ's finding that Plaintiff was not disabled.

## C.

Next, Plaintiff claims that the ALJ erred in failing to properly consider the impact of her obesity as required under SSR 02-01P.

The ALJ found obesity to be a "severe" impairment. Under SSR 01-02p:

> Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying,

-17-

>pushing, and pulling. It may also affect ability to do postural
>functions, such as climbing, balance, stopping, and crouching.
>The ability to manipulate may be affected by the presence of
>adipose (fatty) tissue in the hands and fingers.

Additionally, SSR 01-2p states that: "the combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone."[4]

In July 2007, Plaintiff was 5'10" and 254 pounds. (Tr. 575). This results in a BMI of 36, classifying Plaintiff as obese. Plaintiff testified that he was 271 pounds at the hearing. (Tr. 79). The ALJ expressly addressed Plaintiff's obesity stating that "the claimant's obesity would negatively impact his overall general health especially a back condition." (Tr. 60). However, the ALJ properly found that the evidence prior to Plaintiff's date last insured did not document that Plaintiff was disabled or required greater limitations than those in her RFC finding. The ALJ noted that Plaintiff received only conservative treatment during the relevant period and required neither an ambulatory aid nor surgical intervention. (Tr. 15). Accordingly, the ALJ properly evaluated Plaintiff's impairments, including his obesity, in finding that he was not disabled prior to the expiration of his insured status on March 31, 2008.

---

[4] Specifically, Plaintiff notes that Defendant fails to address his inability to manipulate due to the presence of adipose (fatty) tissue in the hands and fingers. (Tr. 14 at 3). While this Court notes that the objective evidence does support a finding that Plaintiff is unable to properly manipulate objects with his fingers (*see supra*, tr. 660), such evidence dates from March 23, 2010, well after the date last insured.

## III.

For the foregoing reasons, Plaintiff's assignments of error are unavailing. The ALJ's decision is supported by substantial evidence and is affirmed.

**IT IS THEREFORE ORDERED THAT** the decision of the Commissioner, that Thomas Morris was not entitled to disability insurance benefits, is found **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**; and, as no further matters remain pending for the Court's review, this case is **CLOSED.**

        *s/ Timothy S. Black*
        Timothy S. Black
        United States District Judge